CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 3 1 2009

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

DONELL J. BLOUNT, SR.,　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiff,　　　　　　　　　)　　　Case No. 7:08CV00471
　　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)　　　**MEMORANDUM OPINION**
　　　　　　　　　　　　　　　　　　　　)
LT. DELMER TATE, ET AL.,　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)　　　**By:　Glen E. Conrad**
　　　　　　　Defendants.　　　　　　　　)　　　**United States District Judge**

Plaintiff Donell J. Blount, Sr., a Virginia inmate proceeding pro se, brings this action as a civil rights complaint pursuant to 42 U.S.C. § 1983 and Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § § 2000cc to 2000cc-5. Blount alleges that various officials at Red Onion State Prison placed him on a "diet loaf" that was not consistent with his religious dietary beliefs, in violation of the First Amendment, RLUIPA, and the Due Process Clause of the Fourteenth Amendment, and used excessive force against him, in violation of the Eighth Amendment.[1] The matter is now ripe on defendants' motion for summary judgment to which Blount has responded. Upon review of the record, the court finds that defendants' motion for summary judgment must be granted.

---

[1] As relief in this action, Blount seeks compensatory, nominal, and punitive damages, as well as declaratory relief. The United States Court of Appeals for the Fourth Circuit has recently held that RLUIPA does not authorize claims for money damages against an official who is sued in her individual capacity in reliance on the Spending Clause facet of the statute. Rendelman v. Rouse, 569 F.3d 182, 189 (4th Cir. June 25, 2009). Because the Rendelman case did not advance any claim under the Commerce Clause facet of RLUIPA, however, the Fourth Circuit left open the question of whether claims for monetary damages might be authorized in that context against an official in her individual capacity. Id. Although it does not appear that Blount has raised his RLUIPA claims under its Commerce Clause nexus, his claim for declaratory relief under RLUIPA is not foreclosed by the Rendelman decision. Moreover, he simultaneously raises his religious rights claims under the Free Exercise Clause as well as RLUIPA. Accordingly, the court will analyze his RLUIPA claims along with his Free Exercise claims, with the understanding that his RLUIPA claims for monetary damages against the defendants in their individual capacities are already without merit to the extent that he raises them in reliance on the VDOC's receipt of federal funding.

## Standard of Review

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is properly granted if "there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party. Terry's Floor Fashions, Inc. v. Burlington Indust., Inc., 763 F.2d 604, 610 (4th Cir. 1985). Rule 56(c) mandates entry of summary judgment against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex v. Catrett, 477 U.S. 317, 322 (1986).

A verified complaint by a pro se prisoner based on personal knowledge is the equivalent of an opposing affidavit and may, standing alone, defeat a motion for summary judgment. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). Where a pro se plaintiff fails to respond to defendants' specific evidence contradicting the conclusory allegations of his complaint, however, defendants may be entitled to summary judgment. Davis v. Zahradnick, 600 F.2d 458, 460 (4th Cir. 1979).

In analyzing defendants' motion for summary judgment, the court considers the evidence as to each claim in the light most favorable to Blount as the non-moving party and concludes that he fails to establish a genuine issue of material fact in dispute. Therefore, defendants are entitled to summary judgment as a matter of law.

## Religious Diet Claims

### A. Allegations and Claims

Blount's first set of related claims is based on the following alleged sequence of events. Blount has been approved to receive the Common Fare Diet ("CFD"), based on his religious beliefs.[2] On April 18, 2008, his CFD lunch meal tray was missing vegetables. He returned the tray for inspection by the kitchen supervisor. Sgt. James Lyall refused to return the tray to the kitchen and, instead, allowed it to be dumped in the trash without providing Blount with another meal. Blount filed an emergency grievance about this incident.

After Blount removed his evening meal from the tray slot cover box, he briefly placed his hand on the food tray slot until officers complied with his demand to speak with a building supervisor. Lt. Artrip and Lt. McCoy came to Blount's cell, and he explained to them about the problems he had had with his lunch meal tray. Then, he ate his supper meal and returned his tray. Lyall allegedly said he would teach Blount a lesson about filing emergency grievances "even if he had to get someone to fabricate a charge to justify taking Blount's religious diet and putting him on an unkosher loaf diet."

From April 19-25, 2008, officials fed Blount "an unkosher diet loaf in violation of his sincerely held religious belief to eat kosher food."[3] On April 20, 2008, a disciplinary charge was placed against Blount, alleging that he had put "pants" in his tray slot on April 18, 2008. Officials indicated that the "pants" incident was also the reason that Blount was placed on diet

---

[2] The court takes judicial notice that in a previous lawsuit, Blount offered evidence that he is a follower of the religious teachings of the House of Yaweh, a religious faith whose adherents follow a kosher diet. See, gen., Blount v. Johnson, Case No. 7:04CV00429 (W.D. Va. 2007).

[3] Although Blount characterizes the diet loaf as "unkosher," he does not otherwise describe it. Defendants' evidence indicates that this alternative meal service meets basic nutritional requirements and is vegetarian. (Ray Affid. ¶ 13.) Its use is governed by Division Operating Procedure ("DOP") 420.2, Use of Restraints and Management of Offender Behavior, a policy not available for inmate viewing based on security concerns. Under the policy, only the Facility Unit Head or an acting representative or a responsible health authority may impose the restrictive feeding program on an inmate after misconduct involving the throwing of body waste at employees or the deliberate disruption of food service operations through the misuse or abuse of food service utensils or equipment or throwing of food or drink at any employee. The appropriate use of the diet restriction is determined on a case-by-case basis, and the policy makes no exception for inmates who are otherwise approved to receive a religious diet.

- 3 -

loaf for a week. The charging document listed Officer McCowan as the reporting officer and Lt. Tate as having reviewed and approved the charge. At the disciplinary hearing on this charge, McCowan testified that he was the reporting officer and had nothing to add to his written report. Blount pleaded guilty in an attempt to avoid a harsher penalty for this "bogus charge." He was sentenced to seven days in isolation, which allegedly caused him "extreme depression and anxiety" because he lost his recreation privilege during this period. After the hearing, McCowan told Blount that he had not written the charge or signed it; he claimed that Lyall and Tate had ordered him to testify as he did at the hearing. After this signature problem was investigated, Warden Ray dismissed the April 20, 2008 charge. Blount had already served the isolation term, however.

The court construes Blount's submissions as raising the following claims:

1a. Defendants Lyall and others[4] retaliated against Blount for filing an emergency grievance, and violated his due process rights, when they fabricated a disciplinary charge against him in order to deprive him of his Common Fare religious meals for a week;[5]

1b. Defendant Quinn Reynolds ordered that Blount be placed on the diet loaf from April 19-25, 2008, in violation of his rights under RLUIPA and the First Amendment.[6]

---

[4] Blount alleges that Lyall, Tate, McCowan, and a John Doe defendant who forged McCowan's name on the disciplinary report conspired to retaliate against him by getting him placed on diet loaf.

[5] Blount sought discovery of the name of the officer who had signed McCowan's name to the April 20, 2008 disciplinary charge. After some initial difficulty in determining the identity of this individual, defendants objected to providing the name to Blount, based on security concerns. The magistrate judge sustained this objection and denied the discovery, with the proviso that if the claims related to this individual survived summary judgment, the court would revisit the issue. The court herein finds, however, that Claim 1a fails to state any actionable claim under § 1983.

[6] Blount seeks to add a John Doe defendant to this claim. Initially, Blount did not know which officers had ordered that he be placed on diet loaf, instead of his CFD meals. Through discovery, he learned that Quinn Reynolds had authorized this temporary change and amended his complaint to name Reynolds as a defendant. He also wished to add as a defendant to this claim the individual who forged McCowan's "contacted [Reynolds] to authorize the loaf." The court herein concludes that Claim 1b must be dismissed pursuant to 42 U.S.C. § 1997e(a) because Blount failed to exhaust administrative remedies regarding his argument that the diet loaf is not kosher. Accordingly, Blount is not entitled to discover the name of the individual who signed the disciplinary report.

- 4 -

## B. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983] or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). It is well established that the exhaustion requirement is mandatory, Anderson v. XYZ Correctional Health Services, Inc., 407 F.3d 674, 677 (4th Cir. 2005), and that the requirement "applies to all inmate suits about prison life." Porter v. Nussle, 534 U.S. 516, 532 (2002). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." Woodford v. Ngo, 548 U.S. 81, 90 (2006). Proper exhaustion also requires that complainants "give the agency a fair and full opportunity to adjudicate their claims." Id. An inmate's failure to exhaust is an affirmative defense, which the defendant has the burden to prove. See Jones v. Bock, 549 U.S. 199, 216 (2007). Courts strive to apply the PLRA exhaustion requirements in a manner consistent with the stated goals of the provision, which include: "allowing a prison to address complaints about the program it administers before being subjected to suit [and] reducing litigation to the extent complaints are satisfactorily resolved . . ." Id. at 219.

Defendants attach to their motion a copy of Virginia Department of Corrections ("VDOC") Division Operating Procedure ("DOP") 866.1, the grievance procedure available to Blount at Wallens Ridge, and an affidavit from F. Taylor, the grievance coordinator at Red Onion. Under DOP 866.1, an aggrieved inmate must follow three distinct steps to exhaust the procedure's remedies. First, he must make a good faith effort to resolve the issue informally, by pursuing an informal complaint to the appropriate department head. If the inmate is not satisfied with the response to the informal complaint, he may file a regular grievance within 30 days from the occurrence or incident. The inmate must attach the informal complaint to his regular grievance form or explain in the grievance text his informal attempts to resolve the problem. The warden or his representative responds to this grievance (Level I). If the inmate is not satisfied

- 5 -

with the response, he may appeal to the regional director (Level II). For most issues, Level II is the last level of available review under DOP 866.1. An emergency grievance is not part of the exhaustion process under VDOC policy.

Defendants argue that Blount failed to exhaust administrative remedies regarding his current claim that being forced to eat the diet loaf violates his religious beliefs.[7] F. Taylor states: "I have reviewed Blount's inquiry list showing all grievances he has filed back to June of 2005 and there is no record of his filing any grievances regarding the diet loaf not being kosher.[8] He has not exhausted this allegation." (Taylor Affid. ¶ 12.) Warden Ray also states in his affidavit: "[I]t is my understanding that Blount has been placed on restrictive feeding numerous times (twice in 2008 and three times in 2007), and not once has he filed a grievance complaining that the diet loaf is not kosher and non-compliant with his religious dietary needs." (Ray Affid. ¶ 13.)

Blount countered these affidavits with copies of the informal complaint, regular grievance, and appeal that he filed concerning the April 18, 2008 incident. (Dkt. 41 Ex. 1-3.) In the informal compliant, dated April 26, 2008, he stated:

> My right to eat a kosher diet was violated April 19-25, '08 when I was fed unkosher loaf meals for holding my slot open. There was no penological interest served by changing my food. Once I released the slot the disturbance was over. I did not misuse my food nor food utensils; the purpose of the loaf is to stop such abuse. No one can say, reasonably, that putting me on the loaf was to prevent me holding the slot, or to restore order (I held the slot/released it on April 18, '08 [due] to being denied my lunch.

In his May 4, 2008 response, Lt. L. Fleming stated: "You were placed on restricted feeding in accordance with current and applicable policies. You were placed on restricted feeding due to

---

[7] Defendants also offer evidence that Blount did not exhaust his administrative remedies regarding any claim that he was provided with an inadequate CFD meal on April 18, 2008. He filed an informal complaint and a regular grievance (Level I of the procedures) on this issue. However, he did not pursue a Level II appeal to the regional director. Blount offers no dispute of this evidence. Hence, this aspect of his religious diet claim is not exhausted as required under § 1997e(a).

[8] Taylor explains that the "inquiry list" is her own record, listing a brief statement of the primary issue the inmate is attempting to grieve in each grievance submitted; she uses the list to determine whether certain issues have been grieved by a given inmate. (Taylor Suppl. Affid. ¶ 5.)

- 6 -

you interrupting the feeding procedures." In his regular grievance, dated May 7, 2008, Blount stated:

> My right to eat a kosher diet was violated April 19-25, '08 when I was fed unkosher loaf meals for hold[ing] my door slot open. There was no penological interest served by changing my food. Once I released the slot the disturbance was over. I did not misuse my food or my food utensils (the purpose of the loaf is to stop "this" kind of abuse). No one can say, re[a]sonably, that putting me on the loaf was to prevent me from holding the slot, or to restore order (I held/released the slot on April 18, '08 d[ue] to being denied my lunch). The response by L. Fleming, though typical, fails to address why I was denied my religious diet, which caused me to defile my body [from April 19-25] when the slot had been secured on the 18th. He's arguing that since it happened during feeding time (holding slot) it was policy to put me on loaf/change my food. I have documented proof that holding the slot is not cause to put me on loaf.

In answer to the question on the grievance form, "What action do you want taken," Blount stated: "I want those responsible for violating my rights corrected. I want someone to tell me why it is that if a prisoner holds the slot open at pill pass or recreation/shower pull he's not put on the loaf for 7 days." The warden's Level I grievance response, dated June 11, 2008, states:

> Documentation confirms that you interrupted feeding procedures by blocking your tray slot on April 18th after removing your food tray from the feeding box. As a result of your actions you were placed on restricted feeding for seven days starting with the breakfast meal on April 19th and ending with the dinner meal on April 25[th]. There has been no violation of policy or procedure.

The warden ruled the grievance "unfounded." Blount appealed to the regional director. In upholding the Level I response, the regional director stated in his Level II response dated June 20, 2008: "Your complaint regarding being placed on restricted feeding has been investigated. Investigation revealed Red Onion State Prison acted in accordance with policy. Security Procedures and Feeding Procedures govern this issue." Blount argues that because he mentioned at each level of the grievance procedure that the diet loaf was unkosher and violative of his religious beliefs, he has exhausted all of his religious diet claims concerning the April 18, 2008 incident.[9]

---

[9] Blount also submits copies of informal complaints and grievances that he filed in 2007 regarding other incidents in which he was placed on diet loaf after disrupting the feeding procedures. (Dkt. No. 46 Ex. 1-2.) Like the administrative remedies addressing the April 18, 2008 incident, the 2007 complaints describe the diet loaf as "unkosher" and state that it violates his religious beliefs to touch it.

- 7 -

Defendants maintain that Blount has not exhausted administrative remedies regarding the nonkosher nature of the diet loaf. Ray explains that under the VDOC grievance procedures, inmates are to raise only one issue per grievance and that administrators will address only one issue per grievance. (Ray Suppl. Affid. ¶¶ 4-5.) Lt. Fleming, Warden Ray, the regional director, and Taylor each reasonably interpreted Blount's grievance documents regarding the April 18, 2008 incident to be challenging whether placement on the diet loaf was an excessive or procedurally correct sanction for his admitted misbehavior of blocking the tray slot.[10] (Dkt. No. 41 Ex. 1-3; Ray Suppl. Affid. ¶ 5; Taylor Suppl. Affid. ¶ 5.) This reading of Blount's arguments is strongly supported by his request for relief on the regular grievance: to have the officers corrected and to know why holding the tray slot open other than during feeding times is not punished by placing the inmate on diet loaf. This demand for relief asked prison officials to find that he was given the wrong punishment for his conduct. At no point in his administrative remedy requests did Blount explain to officials specifically why he believed the diet loaf was inconsistent with his dietary beliefs or demand to receive a kosher version of the loaf in the future.[11] In so doing, he did not give prison officials a full and fair opportunity to address this aspect of the situation. Accordingly, the evidence establishes that Blount failed to exhaust administrative remedies properly as to his current claims that being placed on the diet loaf in April 2008 violated his rights under the First Amendment or RLUIPA. He thus failed to comply with § 1997e(a) before filing this lawsuit, and defendants are entitled to summary judgment on that ground as to Claim 1b, alleging violations of Blount's free exercise rights under the First Amendment and RLUIPA.

---

However, the core grievance that these documents present is Blount's belief that officers slammed his arm in the tray slot in retaliation for verbal threats he made against them.

[10] Even now, as relief in this lawsuit, Blount is seeking declaratory relief stating that imposition of the diet loaf restrictive feeding program is an inappropriate sanction for misuse of the food tray slot.

[11] Defendants' evidence indicates that the diet loaf is vegetarian, and Blount himself believes that it contains only vegetables.

- 8 -

## C. Due Process

"The Fourteenth Amendment does not "protect every change in the conditions of confinement having a substantial adverse impact on the prisoner." <u>Sandin v. Conner</u>, 515 U.S. 472, 478 (1995). Rather, process is due only before changes in prison conditions that inflict an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." <u>Id.</u> at 484. "[T]he fine-tuning of the ordinary incidents of prison life" is a task for prison officials, not federal courts.[12] <u>Id.</u> at 483.

Blount apparently complains that he was denied due process in relation to both of the disciplinary penalties imposed on him for the April 18, 2008 incident with his food tray slot: (1) the seven days in isolation imposed by the disciplinary hearing officer, and (2) his placement on diet loaf for seven days the day after the tray slot incident, pursuant to Reynolds' order. Both of these due process claims fail.

Defendants offer evidence that the disciplinary sanction imposed on Blount after his conviction on the disciplinary charge for refusing to comply with orders to unblock his tray slot on April 18, 2008 – a week in isolation – was not an atypical hardship under <u>Sandin</u>. Because of his history of violence, Blount is customarily confined in his single-man cell approximately 23 hours every day. When he is released from his cell, he is handcuffed and shackled and escorted by at least two officers. He had no good conduct time to be revoked, so the sanction did not affect the duration of his confinement. The only differences Blount experienced as a result of confinement in isolation was a temporary loss of out of cell recreation time and a temporary loss of personal property. These minimal changes to the conditions of his confinement do not rise to "atypical or significant hardship" under <u>Sandin</u> so as to trigger any requirement for federal due

---

[12] In the first paragraph of his complaint, Blount asserts that his "substantive due process" rights have been violated in some unidentified respect. The Court in <u>Sandin</u> recognized that some forms of restraint might exceed an inmate's criminal sentence "in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force." 515 U.S. at 484. Blount has no such claim here, however. Diet loaf for a week did not affect, to any extent, the level of restraint under which Blount was confined, pursuant to his criminal sentence.

- 9 -

process protection before such charges are imposed. Moreover, the disciplinary charge has been dismissed, based on the warden's finding of procedural problems with the signature on the charge document.

Blount also fails to demonstrate that placement on diet loaf from April 19-25, 2008 violated his federal due process rights under Sandin. Blount has a constitutionally created liberty interest in receiving a diet consistent with his sincere religious beliefs. See Wilkinson v. Austin, 545 U.S. 209, 221 (2005); Lovelace v. Lee, 472 F.3d 174, 198 (4th Cir. 2006). Because he failed to exhaust his administrative remedies as to his assertion that the diet loaf is not consistent with his religious beliefs, however, he is barred under § 1997e(a) from pursuing a due process claim in this lawsuit that relies on a liberty interest in avoiding the diet loaf for religious reasons. Thus, unless Blount proves that the diet loaf itself poses a significant hardship in relation to the normal conditions of prison life so as to create a federally protected liberty interest under Sandin, he fails to establish the elements of his due process claim here.

This court has previously ruled against Blount on such a claim. See Blount v. Johnson, No. Civ. A. 7:05CV00556, 2006 WL 335606, *3 (W.D. Va. 2006) (dismissing Blount's claim that he was entitled to hearing before being placed on diet loaf) (citing Gates v. Huibregtse, 69 Fed. App'x 326, 328 (7th Cir. 2003) ("Prison is hardly known for its fine dining"; finding that imposition of "nutri-loaf" diet as punishment for misconduct during meal service was not atypical and significant hardship in relation to the ordinary incidents of prison life, and thus due process did not require officials to hold hearing before imposing punishment) (unpublished)). The court finds no ground requiring a different disposition in this case.

The video tape that Blount asked the court to view in support of his arguments against summary judgment establishes that Blount's behavior on April 18, 2008 substantially disrupted the prison's standard procedures for feeding the inmates in his cell block. Angry that no one had addressed his emergency grievance about his lunch tray, he admits placing his arm and his shirt in the tray slot cover box. As the officers use this box to protect themselves from inmate assaults

- 10 -

through the tray slot while passing each inmate his food tray, the supper service ceased while Blount shouted curses and threats at the officers. He ignored their repeated orders to remove his "stuff" from the box and tray slot, even after he was sprayed with pepper spray. At one point, Blount yelled that he did not "give a shit about no charges." Only after officers threatened to spray him with another chemical agent did he remove his arm and clothing from the box and allow the tray slot to close so that the officers could retrieve the box and resume feeding the other inmates.

Even imposed as punishment, a temporary change of diet that provides daily nutritional minimums clearly falls within "the expected perimeters" of Blount's sentence.[13] <u>Sandin</u>, 515 U.S. at 485. While taste and texture of the diet loaf are, no doubt, not as desirable as normal prison meals or CFD meals, being punished with such discomforts for disruptive behavior such as Blount exhibited on April 18, 2008, is not an atypical hardship. This inmate control mechanism, used to discourage inmates from repeated interference with food service operations, compares in degree to the temporary suspensions of privileges routinely used to penalize inmates convicted of disciplinary offenses. <u>See also</u> <u>McEachin v. McGuinnis</u>, 357 F.3d 197, 200-01 (2d Cir. 2004) (affirming district court's finding that placement of Muslim inmate on restrictive diet loaf for one week during Ramadan did not pose an "atypical and significant" hardship sufficient to implicate inmate's due process rights under <u>Sandin</u>); <u>Turnboe v. Gundy</u>, 25 Fed. App'x 292, 293 (6th Cir. 2001) ("In <u>Sandin</u>, the Court cited with disapproval a case suggesting that a prisoner has a due process right not to be served food loaf. [515 U.S.] at 482-83. . . . Thus, a due process claim based upon being fed food loaf is no longer viable.") (other citation omitted); <u>Ostrander v. Trippett</u>, 71 Fed. App'x 565, 566 (6th Cir. 2003) (under <u>Sandin</u>, finding no due process right implicated by placement of inmate on food loaf diet for two weeks after he refused to comply with order to close food slot door). Based on the foregoing, the court concludes that

---

[13] Defendants' evidence indicates that the diet loaf must meet basic nutritional needs and that policy authorizes placing an inmate on diet loaf when he has deliberately disrupted food service operation. (Ray Affid. ¶ 13.)

no genuine issue of material fact remains in dispute, and defendants are entitled to judgment as a matter of law as to Blount's due process claims.

## D. Retaliation

Claims of retaliation by inmates are generally treated with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds to prisoner misconduct." Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996); Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994). To succeed on a retaliation claim under § 1983, an inmate must allege facts sufficient to demonstrate that the alleged retaliatory act "was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." Adams, 40 F.3d at 75.

In Claim 1a, Blount alleges that because he filed an emergency grievance about Officer Lyall's refusal to correct the problem with his lunch tray on April 18, 2008, Lyall and other officers conspired to retaliate against him by filing a false charge against him.[14] Because inmates have no constitutional right to a grievance procedure regarding jail conditions, Adams, 40 F.3d at 75, Blount was not exercising any constitutionally protected right when filing the emergency grievance about his missing vegetables. Therefore, any adverse action that officers may have taken against him because of that grievance cannot give rise to a claim of retaliation actionable under § 1983. Thus, to the extent that Blount poses a retaliation claim related to the incident on April 18, 2008, it must be dismissed as legally frivolous, pursuant to 28 U.S.C. § 1915A(b)(1).[15]

---

[14] Because counsel for defendants interpreted Blount's complaint as raising religious rights claims and due process claims in connection with the April 18, 2008 incident, defendants' motion for summary judgment does not address Blount's claim of retaliation.

[15] Pursuant to §1915A, the court may, at any time, summarily dismiss an action filed by a prisoner against government officials as frivolous, malicious or for failure to state a claim.

- 12 -

### E. Equal Protection

In his response to defendants' motion for summary judgment, Blount also appears to raise a claim of differential treatment. He relates two stories about other Red Onion inmates who were charged and convicted in 2008 of disciplinary infractions for blocking their tray slots for reasons related to their Ramadan meals; neither inmate was put on the loaf diet for this behavior. Although Blount submits an informal complaint that he filed, asking why these prisoners were not put on diet loaf like he was for blocking the tray slot, he does not allege or document exhaustion of administrative remedies as to this claim, pursuant to 42 U.S.C. § 1997e(a).

In any event, his allegations fail to state a constitutional claim. To prove an equal protection claim, a litigant "must first demonstrate that he has been treated differently from others with whom he is <u>similarly situated</u> and that the unequal treatment was the result of intentional or purposeful discrimination." <u>Veney v. Wyche</u>, 293 F.3d 726, 730 (4th Cir. 2002) (internal quotation marks omitted and emphasis added). Blount offers no evidence that he is similarly situated with these inmates with respect to their histories of violent behavior or that the incidents in which they blocked their tray slots caused the same level of disruption as did Blount's conduct on April 18, 2008. The court will, therefore, summarily dismiss any attempted equal protection claim related to the diet loaf incident, pursuant to § 1915A(b)(1).

### <u>Excessive Force Claims</u>

### A. Applicable Law

"After incarceration, only the unnecessary and wanton infliction of [more than <u>de minimis</u>] pain on prisoners constitutes cruel and unusual punishment" in violation of the Eighth Amendment. <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986) (internal quotations omitted); <u>Hudson v. McMillian</u>, 503 U.S. 1, 6-7 (1992).

> For an inmate to prove an excessive force claim, he must satisfy not only the subjective component that the correctional officers acted with a sufficiently culpable state of mind, but also the objective component that his alleged injury was sufficiently serious in relation to the need for force to establish constitutionally excessive force.

- 13 -

Stanley v. Hejirika, 134 F.3d 629, 634 (4th Cir. 1998). Plaintiff must prove that the force was applied "maliciously and sadistically for the very purpose of causing harm," rather than "in a good faith effort to maintain or restore discipline." Id. (quoting Whitley, 475 U.S. at 320-21). This determination considers such factors as the amount of force used as related to the need for force, the threat reasonably perceived by the officers, and any attempts the officers made to "temper the severity of a forceful response." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996).

To prove the objective aspect of his excessive force claim, the inmate "must show that correctional officers' actions, taken contextually, were 'objectively harmful' enough to offend 'contemporary standards of decency.'" Stanley, 134 F.3d at 634 (quoting Hudson v. McMillian, 503 U.S. 1, 8 (1993)). This part of the analysis "evaluates the force applied and the seriousness of the resulting injury against the need for the use of force and the context in which that need arose." Id. Prison administrators are entitled to broad deference in determining what policies and practices are necessary to preserve or restore security and order. Id.

> Thus, when prison security measures are taken in response to an uprising or prison disturbance, the courts cannot always expect a perfectly measured response. "The infliction of pain in the course of a prison security measure, therefore, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." [Whitley], 475 U.S. at 1084. On the other hand, when a prisoner is held and calmly beaten by two guards in response to a verbal argument, the de minimis level is more easily reached.

Id. See also Whitley, 475 U.S. at 326 (finding that in context of quelling major prison disturbance, officer's shooting inmate in the leg was "part and parcel of a good-faith effort to restore prison security").

No constitutional issue arises where an officer's use of force was de minimis; thus, de minimis injury can be conclusive evidence that the use of force was not objectively harmful enough to be unconstitutional. Norman v. Taylor, 25 F.3d 1259, 1262, 1263 (4th Cir. 1994)

- 14 -

("[A]bsent the most extraordinary circumstances, a plaintiff cannot prevail on an Eighth Amendment excessive force claim if his injury is de minimis.").

> [I]n determining whether injuries are de minimis, we generally consider the following: the context in which the injuries were sustained; whether the inmate sought medical care; whether the injuries were documented in medical records; and whether the documented injuries are consistent with the application of the amount of force necessary under the particular circumstances.

Williams v. Collier, No. 08-6759, 2009 WL 2171236, *2 (4th Cir. July 22, 2009) (citing Taylor v. McDuffie, 155 F.3d 479, 484-85 (4th Cir. 1998). However, some forms of force may leave little or no enduring injury and yet cause an impermissible level of pain; such circumstances may satisfy the objective aspect of a force claim if (1) the force is of a sort "repugnant to the conscience of mankind" and therefore outside the de minimis force exception or (2) the pain itself "constitute[s] more than de minimis injury." Norman. 25 F.3d at 1263 n.4.

### B. Blount's Allegations

Blount's second set of claims alleges that Officers Tate, Collins, and Boyd used excessive force against Blount on October 27, 2006.[16] Earlier that day, Blount had filed an emergency grievance, asserting that he was having chest pains. Supervisor (then a sergeant) Delmer Tate had allegedly ignored his request for medical care, but then came to take Blount to triage.[17] Blount requested assistance from another officer, claiming that Tate had previously made assaults and threats against him. Tate told Blount that he could go to the medical unit with Tate or not at all. Blount complied.

Tate and Officer Collins (and Officer Boyd, who was operating a video camera) escorted Blount to the triage room. As Blount sat on the examination table, talking to Nurse Boyd, Tate dug his fingers into Blount's left wrist, causing sharp pain. Blount pulled back "instinctively,"

---

[16] In addition to his allegations in the complaint, Blount offers a more detailed account of the October 27, 2006 incident in his response to defendants' motion and asks the court to view the video recording filmed of portions of the relevant events.

[17] Blount does not state any specific claim against Tate for depriving him of prompt medical treatment on October 27, 2006. Moreover, he fails to allege any injury he incurred as a result of Tate's alleged delay.

- 15 -

trying to free his wrist from the pain and to kick out as Tate lunged at him. Collins and Boyd jumped on Blount and forced him back onto his stomach to be rehandcuffed. At some point during this process, Tate tried to pull Blount off the triage table by pulling on the shackle chain between his feet. After Blount was restrained and no longer struggling, Tate pinned Blount's head, right side down, on the table and repeatedly punched him in the left eye. Tate and two other officers dug their fingers and elbows into Blount's pressure points on his neck and underarms, causing "excruciating" pain to shoot through Blount's eyes, head, and neck. Collins and Boyd beat him about his back and genitals.

Blount alleges suffering several injuries as a result of defendants' actions. He suffered "extreme pain on his body [and] genitals" and urinated blood. His left eye swelled "to several times its size" until it closed up. The eye also had a "stop sign red blood clot on the white of the eyeball," the skin around it turned dark purple, and he had "a hard nodule under his eyelid." He was unable to see out of that eye for weeks, suffered "extreme pain," and had recurring vision problems. On November 1, 2006, Blount filed an inmate request for services, describing the condition of his left eye and asking to see the optometrist. A nurse informed him that he was on the optometrist's list. The next day, Blount states that he saw Dr. Smith, who diagnosed Blount's eye condition as a "sclera hematoma." On November 16, 2006, officials took Blount to see Dr. Compton for his eye complaints, and the doctor "confirmed" all the medical conditions of the eye that Blount alleges. Blount also alleges that he suffered "extreme pain" when Tate and other officers dug their fingers or elbows into Blount's "pressure points."

### C. Defendants' Evidence

Tate, Collins, and Boyd have each submitted an affidavit to explain the events of October 27, 2006. Boyd notified Tate, who was then a sergeant, that Blount had to be removed from his cell so that Nurse Cox could check his blood pressure. Tate states that because of Blount's history of violence, the major had ordered that any time Blount left his cell, he was to be videotaped with a supervisor present. Tate and Collins restrained Blount and removed him from

- 16 -

his cell, while Boyd operated the video camera. After Nurse Cox took Blount's blood pressure, she said that Blount needed to have an EKG done, so the officers escorted Blount to the triage room.

Blount sat on the triage room table. As Collins uncuffed Blount's hands in order to move them from behind his body to recuff them in the front of his body for the EKG, Blount kicked Tate in the groin as he jerked away from the officers. Blount punched Tate in the mouth with his left hand, injuring his mouth in two places. Then, Blount punched Tate on the side of his forehead. Tate struck Blount on the left eye with his closed hand and then used a pressure point behind his right ear in an attempt to regain control over the inmate. Boyd dropped the video camera to help Collins and Tate restrain Blount, who continued to resist. Once Blount was under control and handcuffed again, Tate called Lt. Younce. Captain McCoy and Lt. Younce arrived shortly in the triage room, and McCoy relieved Tate so that Tate could go to the medical unit to be evaluated. Later that day, Blount was charged with a disciplinary offense of aggravated assault upon a non-inmate. At the November 2, 2006 hearing on this charge, he was found guilty.

Tate states that after Blount first kicked him in the groin and punched him in the mouth and the side of the forehead, he struck Blount in the left eye "in self-defense and to gain control of a violent situation." Tate denies that he repeatedly beat Blount in the head, face, or neck, as Blount alleges. He also states that he did not see Collins or Boyd beating Blount on his back or genitals, and these officers deny any such conduct. The officers state that they used necessary force to gain control over Blount after his assaults on Tate.

The video tape of the October 27, 2006 incident in the triage room clearly shows Blount's legs kicking up and striking Tate, pushing him backward away from the table, and Collins immediately thereafter pushing Blount back onto the triage table, as the inmate struggles. At that point, the tape stops, as Boyd dropped the camera to assist Collins and Tate in subduing Blount. The tape continues at a later point in time, showing several officers holding Blount on his

- 17 -

stomach and in restraints on the triage table with his face turned to the left side. When the officers help Blount move to a sitting position on the end of the table, the viewer can see that the skin around Blount's left eye is noticeably swollen. No other injuries are visible, although Blount makes verbal complaints of being in pain.

The video also shows first Nurse Phipps, and then Dr. Gilbert, examining Blount's eye. Dr. Gilbert advised Blount to apply a cold compress to his eye for swelling. Medical records indicate that he was also provided medication for pain. The records do not indicate that staff noted any other bruising or any lacerations on any other part of Blount's body. After Blount complained later in the day that there was blood in his urine, nurses collected a urine sample. Although the urine was pink, test results were normal. According to the affidavit of the director of nurses at Red Onion, Blount's medical records do not indicate that Blount complained of recurring vision problems as a result of the incident on October 27, 2006.

### D. Discussion

It is clear from the record that Blount does not present a genuine issue of material fact regarding the objective aspect of his excessive force claims. Terry's Floor Fashions, Inc., 763 F.2d at 610. Specifically, he fails to offer evidence with which he could persuade a jury that defendants' actions in addressing his assaultive behavior on October 27, 2006 were "objectively harmful enough to offend contemporary standards of decency." Stanley, 134 F.3d at 634 (internal quotations omitted).

The evidence establishes that Blount's behavior on October 27, 2006 required a forceful response. It is undisputed, and recorded on video, that as soon as one of Blount's hands was momentarily freed from handcuffs in the triage room, he kicked Tate and jerked away.[18] It is

---

[18] Blount characterizes his initial assault on Tate as an "instinctive" response to the "extreme pain" Blount suffered when Tate used a pressure point on the inmate's wrist in an effort to prevent the very type of outburst that occurred. This self-serving use of modifiers is not evidence that Blount's kicking and jerking actions were involuntary in any way. Blount also refers to a limited right that Virginia citizens have under state law to resist an unlawful arrest. Blount, as a convicted inmate in a maximum security prison, however, has no legally recognized right to strike correctional officers in response to discomforts caused by restraint measures.

- 18 -

also undisputed (although not captured on video) that Blount punched Tate twice in the face with his free hand, causing physical injury. This conduct, by an inmate with a known history of violence with hands still uncuffed, triggered an immediate need for substantial force by the officers to prevent further assaults and to restore security and order. Tate's admitted use of his fist to strike Blount in the eye may not have been a "perfectly measured response" to the situation. <u>Id.</u> Given Blount's repeated attacks, however, Tate had both a right to defend himself against additional, potential punches or kicks from Blount and an officer's duty to restrain the struggling inmate. In deference to Tate's expertise as a prison official and the immediacy of the need to regain control, the court cannot find that the sergeant offended "contemporary standards of decency" by punching Blount as he admittedly did, absent evidence that his actions caused injuries disproportionately serious in relation to the nature of the threat Blount posed. <u>Id.</u> Similarly, absent proof of more than <u>de minimis</u> resulting injuries, the court cannot find that the other officers' admitted actions of digging fingers or elbows into Blount's pressure points exceeded "contemporary standards of decency." <u>Id.</u>

Moreover, Blount has failed to forecast sufficient evidence so as to create a genuine issue of material fact as to the extent of the injuries he suffered as a result of any of the defendants' actions while restraining him on October 27, 2006. Some of the injuries alleged in Blount's complaint might cause concern: the eye symptoms he describes, loss of vision in the left eye for weeks, recurring vision problems, blood in his urine, and "extreme pain" from the contact with his pressure points or the alleged beatings. His eye appears very swollen in the video. At this late stage of the litigation, however, the video, and Blount's descriptions of his symptoms, are insufficient to preserve his claim. Defendants offer affidavits and documentation that they could use at trial to support a defense that despite the ugly appearance of plaintiff's eye on the video, the seriousness of Blount's injuries was minimal in relation to the threat posed by his misbehavior. The medical records indicate that the only treatments medical staff found appropriate after the triage room incident were an ice pack, pain medication, and a urine test that

- 19 -

showed everything was normal. Defendants also state that the medical records do not indicate any later complaints from Blount about "recurring vision problems."

In response to defendants' evidence, Blount offers only his affidavit and an inmate request form, dated November 1, 2006, describing the problems with his eye and asking for an eye exam. He states that Dr. Smith diagnosed him on November 2, 2006, as having a "sclera hematoma" and that ten days later, the optometrist "confirmed" the medical complaints Blount had made about his eye. Blount offers no medical records from either of these doctors to support his claims of vision problems or to demonstrate that the doctors prescribed any further treatment for his other eye symptoms.[19] He does not allege or document making requests after November 16, 2006 regarding alleged vision problems. He does not allege that the officers' use of pressure points caused any adverse effects other than momentary pain or demonstrate that he requested medical treatment of any kind for the injuries allegedly inflicted during the incident, other than pain medication initially provided. In short, he fails to contradict defendants' evidence that he has had no long-term, adverse effects as a result of defendants' actions.

Blount had ample opportunity to engage in discovery. The court specifically directed the defendants to certify to the court that Blount had had an opportunity to review his medical records, optometrist records, and the available video tapes.[20] The court obtained copies of the videos so that they could be considered in conjunction with Blount's opposition, as per his request. (See Dkt. No. 47 at p. 3; Dkt. No. 54.) Despite this chance to obtain documentation,

---

[19] For example, a medical information website defines "sclera hematoma" as bleeding from the fragile blood vessels in the conjunctiva, the thin transparent membrane that covers the sclera, the white part of the eye. Andrew A. Dahl, MD, FACS, et al., Subconjunctival Hemorrhage (Bleeding in Eye), http://www.emedicinehealth.com/subconjunctival_hemorrhage_bleeding_in_eye/article_em.htm (last visited July 29, 2009). The condition can occur spontaneously or as a result of trauma to the eye, usually causes little or no pain, and requires no treatment. Id.

[20] After Blount caused a disturbance during the first session when officials arranged for him to view the video tapes and the other records, defendants moved to sanction him for his behavior by barring any further discovery. (Dkt. No. 44.) The court denied this motion and ordered defendants to certify that a second session had been arranged for Blount to view the requested discovery; defendants did so. (Dkt. Nos. 47 and 50.)

- 20 -

Blount has failed to forecast sufficient evidence so as to create a genuine issue of material fact as to the extent of his injuries in relation to the need for force, as necessary to prove that the force used was constitutionally excessive. Therefore, the court concludes that defendants are entitled to judgment as a matter of law as to all of Blount's claims of excessive force.

### Conclusion

For the stated reasons, the court concludes that defendants' motion for summary judgment must be granted and that to the extent Blount raises equal protection or retaliation claims related to the incident on April 18, 2008, such claims must be summarily dismissed, pursuant to 28 U.S.C. § 1915A(b)(1). An appropriate order will enter this day.

The plaintiff is advised that he may appeal this decision pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure by filing a notice of appeal with this court within 30 days of the date of entry of this memorandum opinion and the accompanying order, or within such extended period as the court may grant pursuant to Rule 4(a)(5).

The Clerk is directed to send copies of this memorandum opinion and accompanying order to plaintiff and counsel of record for the defendant.

ENTER: This 31st day of July, 2009.

United States District Judge